## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**EDITH G. HALE,**

      **Plaintiff,**

**vs.**                         **Case No.  1:17cv139-MW/CAS**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the Social**
**Security Administration,**

      **Defendant.**

_____/

## <ins>REPORT AND RECOMMENDATION</ins>

      This is a Social Security case referred to the undersigned magistrate judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.2(D).  It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final determination of the Acting Commissioner (Commissioner) of the Social Security Administration (SSA) denying Plaintiff's application for Supplemental Security Income (SSI) filed pursuant to Title XVI of the Social Security Act.  After consideration of the entire record, it is recommended that the decision of the Commissioner be affirmed.

## I. Procedural History

On November 10, 2014, Plaintiff, Edith G. Hale, filed an application

for SSI, alleging disability beginning December 1, 2000, based on bipolar,

schizophrenia, mental disorders, diabetes, high blood pressure,

depression, high cholesterol, and back problems.  Tr. 25, 100-02, 107-11,

224.[1]

Plaintiff's application was denied initially on February 3, 2015, and

upon reconsideration on April 17, 2015.  Tr. 25, 130-36, 140-45.  On May

15, 2015, Plaintiff requested a hearing.  Tr. 25.  On May 3, 2016, Plaintiff's

representative filed a pre-hearing brief stating, in part, that Plaintiff

indicated she was approved for SSI benefits in 2000, but the benefits were

stopped in 2014 because of her incarceration.[2]  Tr. 292-94; *see infra* at 12

(hearing testimony) and Tr. 32.  The video hearing was held on May 6,

2016, before Administrative Law Judge (ALJ) William H. Greer, appearing

in Jacksonville, Florida, and Plaintiff appearing in Gainesville, Florida.[3]

---

[1]  Citations to the transcript/administrative record, ECF No. 10, shall be by the symbol "Tr." followed by a page number that appears in the lower right corner.

[2]  Social Security benefits are not payable to a claimant who is confined in a correctional facility for conviction of a felony.  42 U.S.C. § 402(x)(1)(A)(i); 20 C.F.R. § 416.1339(a)(2); *see* ECF No. 14 at 6.

[3]  At the hearing, Tr. 47, "[u]pon the advice of counsel, [Plaintiff] has amended her alleged onset date to the date of application, November 10, 2014 (Exhibit 5D)," the date the application was filed.  Tr. 25, 211-12.

Tr. 25, 42-71.  Plaintiff was primarily represented by Bradford D. Myler, an attorney; however, Bradley Howes, also an attorney and authorized representative, appeared at the hearing.  Tr. 25, 42, 44, 171-72.  Plaintiff testified during the hearing.  Tr. 45-67.  C. Kimball Heartsill, an impartial vocational expert (VE), testified during the hearing.  Tr. 25, 67-70, 276-79 (Resume).  Exhibits 1A through18F were received into evidence.  Tr. 44.

On June 28, 2016, the ALJ issued a decision and denied Plaintiff's application for benefits concluding that Plaintiff was not disabled since November 10, 2014, the amended alleged onset date and the date the application was filed.  Tr. 36.

On July 8, 2016, Plaintiff's counsel withdrew from representing Plaintiff.  Tr. 20-21.  On August 20, 2016, Plaintiff's new counsel submitted a request for review of the ALJ's decision, Tr. 15-19, and the Appeals Council granted Plaintiff additional time to submit additional evidence or a statement about the facts and the law in this case.  Tr. 8.  On January 30, 2017, counsel submitted a one-page letter.  Tr. 7.  On April 4, 2017, the Appeals Council denied the request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3; *see* 20 C.F.R. § 404.981.

On June 2, 2017, Plaintiff, by counsel, filed a Complaint with this Court seeking review of the ALJ's decision.  ECF No. 1.  The parties filed memoranda of law, ECF Nos. 14 and 17, which have been considered.

## II. Findings of the ALJ

The ALJ made several findings:

1. "The claimant has not engaged in substantial gainful activity since November 10, 2014, the application date."  Tr. 27.

2. "The claimant has the following severe impairments: disorders of the cervical and lumbar spine, obesity, diabetes mellitus, affective disorders, anxiety-related disorder, and history of polysubstance use disorder."  *Id.*  The ALJ considered several of Plaintiff's medical issues for which she sought treatment including gastroesophageal reflux disease (GERD), hypertension, hyperlipidemia, and a recent history of left forearm fracture. The ALJ determined "the evidence does not show that these impairments have imposed vocationally restrictive limitations for a period of 12 continuous months" and that "these impairments only had a minimal effect on the claimant's ability to perform work-related activities and are therefore not severe."  *Id.*

3. "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."  Tr. 27.  The ALJ considered the effect of Plaintiff's diabetes and obesity "when assessing the claims under the other steps of the sequential evaluation process, including the assessment of her residual functional capacity [RFC]."  Tr. 28.  The ALJ also considered the severity of Plaintiff's mental impairments and whether they met or medically equaled the criteria of listings 12.04, 12.06, 12.09.  The ALJ considered whether the "paragraph B" criteria were satisfied and determined that Plaintiff has *mild*

limitation in activities of daily living;[4] *moderate* limitation in social functioning; *mild to moderate* limitation in maintaining concentration, persistence, or pace; and no evidence that Plaintiff has experienced episodes of decompensation of extended duration.  Tr. 28-29.

4.  "[T]he claimant has the [RFC] to perform light work as defined in 20 CFR 416.967(b) except with no climbing of ladders, ropes, or scaffolds; limited to simple, unskilled, and repetitive tasks; and contact with the general public and coworkers is limited to occasional and must be brief and superficial."  Tr. 29-30.

5.  "The claimant has no past relevant work."  Tr. 35; 68.  (The ALJ made this determination during the hearing.)  The claimant "was 45 years old, which is defined as a younger individual age 18-49, on the date the application was filed."  Tr. 35.  "The claimant has a limited education and is able to communicate in English."  *Id.*  "Transferability of job skills is not an issue because the claimant does not have past relevant work."  *Id.*

6.  "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."  *Id.*  To determine the extent to which Plaintiff can perform all or substantially all the requirements of a full range of light work given additional limitations and the extent to which these limitations erode the unskilled light occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and RFC.  *Id.*  The vocational expert testified that such an individual could perform several representative occupations such as *bone picker* and *machine egg washer*, light exertion, unskilled, with an SVP of 1, and *blade balancer*, light exertion, unskilled,

---

[4]  The ALJ may consider a claimant's daily activities when evaluating subjective complaints of disabling pain and other symptoms.  Macia v. Bowen, 829 F.2d 1009, 1012 (11th Cir. 1987); 20 C.F.R. § 416.929(c)(3)(i).  *But see* Lewis v. Callahan, 125 F.3d at 1441 ("participation in everyday activities of short duration, such as housework or fishing" does not disqualify a claimant from disability).

with an SVP of 2.[5]  Tr. 36; Tr. 68-69.  The vocational expert also
testified that the hypothetical person could perform two
representative jobs that are unskilled and sedentary with
occasional contact with the public and coworkers such as table
worker and waxer each with an SVP of 2.  Tr. 69.  The vocational
expert further testified that if such a person were off task from
work for 15% or more of the workday or absent from work two
days or more a month, this would exceed what is allowable.  *Id.*

7.  "The claimant has not been under a disability, as defined in the
Social Security Act, since November 10, 2014, the amended
alleged onset date and date the application was filed."  Tr. 36.

## III.  Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is

supported by substantial evidence in the record and premised upon correct

---

[5]  "Unskilled work is work which needs little or no judgment to do simple duties
that can be learned on the job in a short period of time."  20 C.F.R. § 416.968(a).  A
Specific Vocational Preparation (SVP) of 1 means "short demonstration only."
Dictionary of Occupational Titles (DOT) (4th ed., rev. 1991), Appendix C: Components
of the Definition Trailer, § II, SVP.  An (SVP) of 2 means "[a]nything beyond short
demonstration up to and including 1 month."  *Id.*  "[SVP] is defined as the amount of
lapsed time required by a typical worker to learn the techniques, acquire the
information, and develop the facility needed for average performance in a specific job-
worker situation."  *Id.*  Unskilled work corresponds to an SVP of 1 and 2.  Social
Security Ruling (SSR) 00-4p, 2000 SSR LEXIS 8, at *8 (Dec. 4, 2000).  Further,
unskilled work is work involving understanding, remembering, and carrying out simple
instructions; making simple work-related decision; dealing with changes in a routine
work setting; and responding appropriately to supervision, co-workers, and usual work
situations.  SSR 85-15, 1985 SSR LEXIS 20, at *10-11 (1985).  In part, "[l]ight work
involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).  "Sedentary work involves
lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
docket files, ledges, and small tools.  Although a sedentary job is defined as one which
involves sitting, a certain amount of walking and standing is often necessary in carrying
out job duties.  Jobs are sedentary if walking and standing are required occasionally
and other sedentary criteria are met."  20 C.F.R. § 416.967(a).

legal principles.  42 U.S.C. § 405(g); <u>Chester v. Bowen</u>, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); *accord* <u>Moore v. Barnhart</u>, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence." <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002) (citations omitted).[6]

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's age,

---

[6]  "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it." <u>Phillips v. Barnhart</u>, 357 F.3d 1232, 1240, n.8 (11th Cir. 2004) (citations omitted).  "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring only to those parts of the record which support the ALJ.  A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ." <u>Tieniber v. Heckler</u>, 720 F.2d 1251, 1253 (11th Cir. 1983).  "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'" <u>Cowart v. Schweiker</u>, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

education, and work history.'" <u>Bloodsworth</u>, 703 F.2d at 1240 (citations omitted).  A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. §§ 416.905(a), 416.909 (duration requirement).  Both the "impairment" and the "inability" must be expected to last not less than 12 months.  <u>Barnhart v. Walton</u>, 535 U.S. 212 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 416.920(a)(4)(i)-(v).

1. Is the individual currently engaged in substantial gainful activity?

2. Does the individual have any severe impairments?

3. Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4. Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[7]

5. Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits. A positive finding at step three results in approval of the application for benefits. At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work. Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled. If the claimant carries this burden, however, the

---

[7] An RFC is the most a claimant can still do despite limitations. 20 C.F.R. § 416.945(a)(1). It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records. *Id.* Although an ALJ considers medical source opinions, the responsibility for determining claimant's RFC lies with the ALJ. 20 C.F.R. § 416.946(c); *see* SSR 96-5p, 1996 SSR LEXIS 2, at *12 (July 2, 1996) (rescinded eff. Mar. 27, 2017) ("The term "residual functional capacity assessment" describes an adjudicator's finding about the ability of an individual to perform work-related activities. The assessment is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomatology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence."); *see also* Cooper v. Astrue, 373 F. App'x 961, 962 (11th Cir. 2010) (unpublished) (explaining claimant's RFC determination "is within the province of the ALJ, not a doctor"). The Court will apply the SSR in effect when the ALJ rendered the decision. *See generally* Bagliere v. Colvin, No. 1:16CV109, 2017 U.S. Dist. LEXIS 8779, at *10-18, (M.D. N.C. Jan. 23, 2017), *adopted*, 2017 U.S. Dist. LEXIS 51917 (M.D. N.C. Feb. 23, 2017).

burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's RFC, age, education, and work experience. Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R. § 416.920(a)(4)(v), (e) & (g). An ALJ may make this determination either by applying the grids or by obtaining the testimony of a vocational expert. Phillips, 357 F.3d at 1239-40; *see* 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

Plaintiff bears the burden of proving that she is disabled, and consequently, is responsible for producing evidence in support of her claim. *See* 20 C.F.R. § 416.912(a)(1); Moore, 405 F.3d at 1211.

## IV. Legal Analysis

**Substantial evidence supports the ALJ's evaluation of the medical evidence, Plaintiff's RFC, her credibility, and the vocational expert's testimony regarding whether Plaintiff is able to perform work in the national economy.**

I.

Generally, Plaintiff argues that substantial evidence does not support

the ALJ's determination of Plaintiff's RFC.  ECF No. 14 at 9, 19-25.

Specifically, Plaintiff claims that the ALJ should have found her disabled at

step 5 of the sequential evaluation process

> because it is entirely credible that as a direct and proximate result of her combination of impairments . . . she cannot be present and function in the workplace eight (8) hours a day five (5) days a week, for an entire month, without being absent from work 2 or more days per month.  And, even assuming she can be present each scheduled workday for 8 hours a day 5 days a week, plaintiff Hale would require too much additional nonproductive time, over the course of the workday in the work week, to meet the productivity expectations of his [sic] employer.  Compounding the diagnostic picture, plaintiff Hale takes in addition to diabetes medications and pain medication three different antidepressants and a [sic] antipsychotic, with the expected and accompanying site effects.

ECF No. 14 at 20.  Plaintiff argues the ALJ erred because he did not

secure a consultative mental health examination and evaluation.  *Id.*

Plaintiff also argues that the ALJ should "have explained his thought

process as to how plaintiff Hale, who only lost her entitlement to continuing

receipt of their [sic] SSI benefits based on her mental health impairments,

because she went to prison, suddenly, post[-]incarceration, will be able to maintain full-time work at the light exertional level."  ECF No. 14 at 20-21.

## II.

Plaintiff provides a Statement of the Facts that includes references to the Plaintiff's hearing testimony, Tr. 46-47; a February 21, 2014, intake psychological screening while she was incarcerated, Tr. 353-54; January 30, 2015, and April 18, 2016, patient records from Meridian, Tr. 396, 647; and the results of a February 2, 2015, consultative examination by Robert A. Greenberg, M.D., Tr. 440, 442.  ECF No. 14 at 6-9.  Plaintiff concludes the Statement of the Facts by noting that there was no mental health consultative examination evaluation after Dr. Greenberg's recommendation, despite his suggestion for a "psychological evaluation if this has not already been done," Tr. 442.  ECF No. 14 at 9.

## III.

During the hearing, Plaintiff testified she had been charged with "battery, breaking in an occupied dwelling or something" and was incarcerated on September 23, 2013, until November 8, 2014.  Tr. 45-47; *see* Tr. 32 (ALJ summary of hearing testimony); *see supra* at n.2.  She had been receiving SSI benefits 14 years prior to September 2013.  Tr. 46.  She recalled the grounds for benefits were based on "[m]ental health" -- a case

manager from Meridian filed the paperwork for her.  *Id.*  Her benefits were approved without hearing.  *Id.*

Plaintiff has an 8th-grade education, but went to the 9th grade. Tr. 47.  She took special education cases because she was dyslexic and spent four years in the 7th grade.  *Id.*  She tried to get a GED and went to classes, but was not successful.  Tr. 48.

At the time of the hearing, she had not worked in the past 15 years, although she "tried a little job but [she] got fired."  She continued to receive payments, however.  *Id.*

The ALJ noted that Plaintiff had little work history back to when the Plaintiff was 17 to 18 years old.  *Id.*  Plaintiff explained that she has "a problem with getting along with people, actually, for a long period of time and staying focused. . . . I get depressed moods real bad.  I've always done that where I just don't want to get out of bed for a few days.  It's been my whole life."  *Id.*  Her mental health is the worst medical condition that keeps her from being able to work.  Tr. 48-49.  Her doctor told her she "was schizophrenic with bipolar traits."  Tr. 49.  She feels "paranoid real bad a lot of times."  *Id.*  She thinks snakes and people are going to get her and people are trying to get into her house.  *Id.*  She also has mood swings where she has three days without sleep and then cries a lot for a few days

"then all of a sudden [she] stop[s]." Tr. 49-50. (The episodes of lack of sleep happen once every 30 days or 45 days at least if she is taking all her medications, but very frequently if she is not taking her medications. Tr. 52)

After a new psych evaluation at Meridian, her treating source placed her on a new medication, but she could not afford them all the time. Tr. 50*.* She took her medications sporadically except for Zoloft and Risperidone -- she does not do without these medications because she gets "suicidal too quick." *Id.* At her most recent visit, she was discontinued on Risperidone and started on new medication which she did not like – "[i]t was terrible." Tr. 51.

She functions "just brilliant" when she is on all her medications. "When [she] can afford to get them all and get them, [she] can function good." *Id.* Prior to incarceration, she took all of her medications, although she "wasn't taking them properly. That's a lie, so that wasn't -- and I was drinking a little bit, and that I don't do anymore. But no, I wasn't taking them properly." *Id.* Plaintiff reiterated that when she takes all her medications, she "function[s] like a normal person." Tr. 51-52. When she was acting like a normal person, there were times when she tried to work

but she would get fired because they said she could not get along with people and keep focused.  Tr. 52.

She takes a lot of medical drugs including insulin and blood pressure medication which is costly.  Tr. 52-53.  She gets help from her mom, uncle, her godparents, and her aunt.  Tr. 53.

Plaintiff described her physical ailments, which include migraine headaches all the time apparently caused by herniated discs in her neck that make her head and eyes hurt.  Tr. 53.  (She gets migraines at least once a day that last all day unless she takes Excedrin or Tylenol and then the migraines last about two hours during which she tries to rest. Tr. 55.)  If she stands, her lower back hurts and then if she stands too long, her leg goes numb all the time with numbness and burning down her left arm and left leg.[8]  Tr. 53, 55.  She had some pain management for her pain for a couple of months paid for by her family.  Pain management helped

---

[8]  Plaintiff stated that she was having pain while seated during the hearing for half hour or so and was "ready to stand for a few minutes."  Tr. 58.  When she feels pain, she tries to do other things like walking a little bit or lean her feet up.  *Id.*  She cries if her back pain is bad.  Tr. 59.  Her best position is to lay down and put a pillow between her legs.  *Id.*  She estimated that her pain is so bad for "probably five" days per week when she has to lie down and on those days, she probably spends five or six hours lying down because she does not "always sleep that good."  *Id.*  Plaintiff cannot lift her 44-pound dog and 20 pounds would be pushing it.  Tr. 59-60.  They told her ten pounds.  Tr. 60.

although the burning and numbness did not go away, but the treatment

ended with no funds to pay for it.  Tr. 55.

Plaintiff had an MRI on her neck in 2015.  Tr. 54; *see* Tr. 31.  Plaintiff

explained that she had a friend that decided to beat her up and choked her

real bad resulting in her main damage; he shook her real bad and abused

her.  Tr. 54.  She explained that she could not pay for her medicine "so

[she] just kind of stayed with the it . . . [f]or a little while."  *Id.*  She went to

North Florida Regional Medical Center after that happened because "[i]t

hurt real bad."  *Id.*  "They called it an altercation incident."  *Id.*

Plaintiff was also treated for high blood pressure, diabetes, and high

cholesterol.  Tr. 56.  She stated that they were "a little bit out of control"

because she could not afford the medications such as insulin and blood

pressure medication.  *Id.*  She takes two shots of insulin a day -- she

actually takes it about two or three days between shots.  *Id.*

Switching topics, Plaintiff stated she abused cocaine and narcotics for

a while and "was an alcoholic for a long while."  Tr. 57.  It has been a few

years since she took cocaine and narcotics.  *Id.*  She is no longer drinking

alcohol -- she last drank alcohol before she went to prison.  Tr. 58.

Plaintiff lives in a mobile home park with her dog.  Tr. 60-61.  The

neighbors, including her family, try to help her.  *Id.*  Her mom helps with

housecleaning.  Tr. 61.  The mobile home is paid for, although her mom

receives "a little rent."  *Id.*  Her neighbor takes her to the grocery store.

Sometimes she hires a taxi paid for by her mom.  *Id.*  Plaintiff can fix things.

Tr. 62.

 The ALJ referred Plaintiff to a patient record from North Florida

Regional Medical Center dated November 4, 2015, which indicates Plaintiff

complained of an injury to her left arm and wrist pain "after a 4x4 fell on it 2

days ago while she was building a fence."  Tr. 62; *see* Tr. 493.  For the next

five pages or so, Plaintiff tries to explain the events leading up to that injury,

an injury to her mom, an altercation between her and another while she

was babysitting, an altercation with her boyfriend, and what she told the

medical personnel about the cause of her injury.  Plaintiff admitted she was

not candid with the medical personnel.  Tr. 62-67.

 The ALJ was confused and further explanations are provided.  Tr. 66-

67.  The ALJ referred Plaintiff to a May 2015 MRI of her cervical spine and

the patient record indicates: "Patient was involved in an altercation about a

week ago who has left sided neck pain and stiffness with left arm pain."

Tr. 66, 446.  Plaintiff explained the nature of this patient note and not being

candid.  Tr. 66-67.  Thereafter, the ALJ and Plaintiff's counsel inquired of

the vocational expert.  Tr. 67-70.

IV.

At step 3 of the sequential evaluation process, the ALJ discussed

relevant evidence related to the functional areas of activities of daily living,

social functioning, and Plaintiff's ability to maintain concentration,

persistence, or pace.  Tr. 28-29.  After considering pre-hearing statements,

*see, e.g.*, Tr. 232-39, and Plaintiff's hearing testimony[9] as summarized

above, Tr. 45-67, the ALJ determined that Plaintiff had *mild* limitation in

activities of daily living, *moderate* limitation in social functioning *mild to*

*moderate* limitation in maintaining concentration, persistence, or pace, and

*no* episodes of decompensation of extended duration.  *Id.* at 28-29.

V.

The ALJ began the RFC analysis with a brief discussion of Plaintiff's

medical records for treatment that took place prior to the amended alleged

onset date.  Tr. 30.  The ALJ determined that "these records fall outside of

the period of adjudication," although he reviewed them and took them into

account

> as part of the claimant's longitudinal history, but they are not
> addressed in the decision below.  In this regard, the undersigned
> acknowledges that these records show that the claimant had a history
> of multilevel degenerative disc disease of the cervical and lumbar
> spine, diabetes mellitus, hyperlipidemia, hypertension, mental

---

[9]  The ALJ referred to Plaintiff's hearing testimony again as part of the RFC
determination.  Tr. 32.

disorder, and polysubstance abuse prior to the amended alleged onset date [Nov. 10, 2014] (*see e.g.* Exhibits 1F-5F) [Tr. 295-435].

*Id.*[10]

The first medical record reviewed by the ALJ after the amended alleged onset date, indicates that in December 2014, Plaintiff initiated mental health treatment at Meridian Behavioral Healthcare (Meridian). Tr. 30.  Plaintiff "was diagnosed with cocaine, alcohol and opioid dependence, as well as schizoaffective and bipolar disorders.  She was started on a medication regimen referred for individual and group therapy (Exhibits 4F and 15 F)."  *Id.*   She was diagnosed with a Global Assessment of Functioning (GAF) score of 55.[11]  Tr. 363; *see* Tr. 359, 365, 367, 384, 407.

---

[10]  The index to the transcript/records, ECF No. 10-1, indicates that Exhibit 4F consists of outpatient hospital records from Meridian dated August 14, 2013, to December 10, 2014, although later-dated records are within these exhibits.  Tr. 358-421.

[11]  The American Psychiatric Association: *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the scale that is primarily used by mental health practitioners.  The GAF Scale is used to report "the clinician's judgment of the individual's overall level of functioning" (with regard to only psychological, social, and occupational functioning) and "may be particularly useful in tracking the clinical progress of individuals in global terms, using a single measure." *See* DSM-IV-TR 32-34.  The GAF scale is divided into 10 ranges of functioning, each with a 10-point range in the GAF scale.  *Id.  See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).  A GAF scale rating of 41-50 is indicative of serious symptoms or any serious impairment in social, occupational or school functioning.  DSM-IV-TR 34. A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*  The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs' and

> By January 2015, Plaintiff reported a stable level of functioning with compliant use of medication, though she was experiencing some symptoms related to medication side effects and grief at the loss of her brother [*see, e.g.*, Tr. 389]. Her medication regimen was adjusted accordingly. Her mental status examination that month revealed mildly depressed and anxious mood, but it was otherwise unremarkable (Exhibit 15F).

Tr. 30; *see* Tr. 377-97, 410, 591-96.

The ALJ discussed Plaintiff's medical history on and after February

2015, before explaining his analysis of the medical evidence. Tr. 30-32.

> The claimant has also received primary care and medication management for her chronic conditions through Palms Medical Group. In February 2015, she had normal physical and mental status examinations, but complained of anxiety, for which she was given Ativan. She was also referred for bloodwork in order to update her treatment plan for diabetes mellitus, hypertension, and hyperlipidemia (Exhibit 5F) [Tr. 429-32].

> Also in February 2015, the claimant underwent an internal medicine consultative examination performed by Robert Greenberg, MD, in connection with this claim. On physical examination, Dr. Greenberg noted obesity, limited range of motion in the hips and lumbar spine, a mild left leg limp, decreased strength in the left leg, and positive straight leg raise tests (though it was not noted whether these were seated or supine). The exam was otherwise normal. An x-ray of the

---

has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)). In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice. In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")." DSM-5 at 16; *see* Finley v. Colvin, No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool."). *See* Tr. 31 at n.1.

lumbar spine showed mild to moderate degenerative disc disease at L5-Sl.  She was diagnosed with bipolar disorder and low back pain secondary to lumbar disc disease (aggravated by obesity).
Dr. Greenberg opined that the claimant's physical impairments would preclude prolonged standing, walking, heavy lifting, and bending (Exhibits 6F and 7F) [Tr. 436, 437-43].  The undersigned has adequately accounted for such limitations in the residual functional capacity.

On follow up at Meridian in March 2015, she still had some mild to moderate mood symptoms, but was otherwise stable and compliant with her medications.  In May, she reported an increase in symptoms and stated that she was out of her medication.  Her regimen was adjusted, but it was noted that she was still stable [Tr. 603-05].  In July, the claimant reported an increase in symptoms and medication noncompliance due to financial constraints [Tr. 606-08].  In August 2015, the claimant was discharged from Meridian's therapy program, as she had stopped attending sessions and was only following up on medication management [Tr. 589-90].  By December 2015, the claimant reported "doing pretty good" with medication [Tr. 609-11] (Exhibit 15F).

A May 2015 MRI of the cervical spine confirmed ongoing degenerative disc and joint disease of the cervical spine (Exhibit 8F) [Tr. 446-47].  In May, June and July 2015, the claimant was treated for chest pain later found to be bilateral pneumonia.  She was prescribed steroids and antibiotics initially, but admitted that she had stopped taking them prematurely.  It was also noted that she was a "heavy smoker" which was an exacerbating factor in the infection (Exhibit 12F).  In August and September 2015, the claimant sought pain management treatment from Sharma Institute of Pain Management.  She was given narcotic pain medication and advised on a home exercise program; however, on follow up, she had inconsistent urine drug screening tests and she was discharged from care (Exhibit 14F).

In October 2015, the claimant reported to her primary care office that she had continuing symptoms, as she was unable to afford her medications [Tr. 449].  The following month, she sought further refills of Ativan, though the system showed she had already filled her

prescription and should have enough to last.  Her examinations that month, and the following month, were unremarkable.  In November 2015, she injured her left forearm resulting in a moderately displaced distal ulnar fracture.  Her arm was placed in a cast and she was given pain medication.  With the exception of the injury, her examinations were unremarkable and she had full ranges of motion and normal mood and affect (Exhibits 9F, 10F and 12F) [Tr. 448-86, 490-562].

In mid-November 2015, the claimant sought orthopedic evaluation of her left forearm fracture [Tr. 471-86].  She was advised that smoking slows the healing of bone injuries and indicated that she understood the need to quit.  Her physical examination revealed healing abrasions and tenderness, but was otherwise unremarkable.  She was placed in short-arm cast and given pain medication.  Two weeks later, she requested a higher dose of pain medication, which was denied.  In December, she was found to be healing satisfactorily, so her cast was removed and she was placed in a splint and advised to increase her activities gradually (Exhibit 13F) [Tr. 465-70].

In January 2016, the claimant returned to Palms Medical Group and requested more pain medication.  Her left arm was still splinted and she had a mildly reduced range of motion.  She was given pain medication and advised to follow up with the orthopedist.  She was also counseled on the importance of healthy diet, exercise, smoking cessation, and medication compliance.  She returned later that month and again in February 2016 to request more narcotic pain medication.  On both occasions, she was denied this request and advised to see her other doctor (Exhibit 16F) [Tr. 612-37].

The claimant returned to Meridian in March 2016 with complaints of worsening symptoms.  She indicated that she was taking care of a sick neighbor, which was a stressor, and she admitted to only partial medication compliance.  She appeared irritable and depressed, and exhibited disorganized thoughts, but otherwise had an unremarkable mental status examination.  The claimant reported that taking her medications "helps her tremendously."  She was continued on her medication regimen and referred for a full evaluation due to polypharmacy use (Exhibit 17F) [Tr. 639-41].  At the evaluation the

following month, she reported compliance with her medications, but later admitted that she was not taking the Haldol daily because of the cost and she felt that the other medications were ineffective. Her regimen was adjusted and she was advised to follow up in two weeks (Exhibit 18F) [Tr. 643-47].

Tr. 30-32. Immediately thereafter, the ALJ referred to Plaintiff's hearing

testimony, summarized *supra*. Tr. 32.

The ALJ then noted

that when a claimant's subjective experience of symptoms suggest a greater level of impairment and can be shown by the objective medical evidence alone, 20 CFR 416.929 and SSR 16-3p direct the undersigned to consider additional factors when assessing the persuasiveness of a claimant's statements. The elements of subjective symptom evaluation include, where relevant, the scope of the claimant's daily activities; the location, duration, frequency, and intensity of the claimant's symptoms; any precipitating or aggravating factors; use of medications; treatment or other measures undertaken for relief of symptoms; and any other pertinent evidence.

In analyzing the claimant's subjective complaints, the first factor the undersigned considered is the claimant's ability to perform daily activities. In November 2014, the claimant reported living independently with her dog. She does household chores and watches television during the day. She is able to handle her personal care without any problems and she prepares simple meals twice per day. She typically spends "all day" cleaning, doing laundry, ironing, and handling small yard tasks. She is able to utilize public transportation, grocery shop twice per month, and handle her finances. She enjoys reading and writing (Exhibit 4E) [Tr. 233-39]. At the hearing on May 6, 2016, the claimant testified that she lives independently,[12] takes care of her dog and relies on neighbors and her mother for assistance with the household and yard. She is able to fix things around the house and do some brief babysitting (but she

---

12 On January 11, 2016, Plaintiff reported to Palms Medical Group that she "lives with mother, says she his [sic] homeless." Tr. 614.

has since put an end to the babysitting).    She is able to sit for 30
minutes, stand or walk for 30-45 minutes, and lift and carry less than
20 pounds.    She is taking some medications now and admitted that
when she is taking all of her medications (i.e. when she takes them
"properly", can afford them, and is not abusing substances) she
functions well.    This indicates that the claimant is able to perform a
fairly wide range of activities of daily living, which is not entirely
consistent with the allegations of an inability to perform work activity.

With respect to the duration, frequency, and intensity of the
claimant's symptoms, the undersigned finds that the claimant does
have severe impairments that result in functional limitations, but the
findings in the record generally indicate that the claimant's
impairments are not debilitating and would not preclude work within
the residual functional capacity above.    The abnormal objective
findings in the record have generally been noted as mild or moderate
in nature and her reports of symptomology have been somewhat
inconsistent.    The undersigned finds that the discrepancy between
the claimant's allegations and the evidence diminishes the
persuasiveness of the claimant's subjective complaints and alleged
limitations.

Regarding precipitating and aggravating factors, the claimant is
noted throughout the record to be obese and to be a daily cigarette
smoker.    She has been advised repeatedly on the need to quit
smoking, follow a healthy diet, and get regular exercise.    She has
also been advised that these issues are aggravating factors in her
other impairments (including diabetes mellitus, chronic pain and
ability to heal).    The undersigned notes that the claimant's failure to
heed medical advice, despite its potential for improving her health,
generally detracts from the persuasiveness of her subjective
statements to the extent that it suggests an aspect of self-limitation.

As to the medication taken to alleviate symptoms, the claimant has
been prescribed appropriate medications for her impairments, but
she does not appear to have been fully compliant with taking these
medications, which detracts from the persuasiveness of her
statements and suggests that the symptoms may not have been
as limiting as the claimant has alleged.    Notably, the claimant
testified (and has reported to various treating sources) that she is

sometimes unable to afford her medications, which is why she is
noncompliant; however, the undersigned notes that the claimant
is considered a "heavy smoker" by treating sources, which
indicates that she has available financial resources that could
potentially be diverted to pay for medications, if she so chose.
She also appears to choose to buy the narcotic and
benzodiazepine medications over her diabetes mellitus,
hyperlipidemia, and hypertension medications.

Regarding treatment and additional measures, other than
medication, undertaken for the relief of symptoms, the
undersigned did not see significant evidence that the claimant
undertook such measures to relieve her symptoms (such as
attending counseling, exercising, losing weight, going to physical
therapy, joining NA/AA support groups, etc.), suggesting that the
symptoms may not have been as limiting as the claimant has
alleged in connection with this application, or, alternatively, that
the claimant is not willing to explore all options that may assist in
improving her health.  Notably, her attempts at treatment seem to
be entirely medication-focused (and particularly focused on
addictive medications, including narcotics and benzodiazepines).
Reports of inability to afford treatment are discounted, as
discussed in the previous paragraph, and in light of the lack of
significant efforts at seeking charitable care.  This issue lessens
the persuasiveness of the claimant's statements regarding the
symptoms and limitations experienced.

The undersigned does not find that there are other factors
concerning the claimant's functional limitations and restrictions
due to symptoms; therefore, after careful consideration of the
evidence, the undersigned finds that the claimant's medically
determinable impairments could reasonably be expected to cause
some, if not all, of the alleged symptoms.  Regardless, the
evidence discussed above suggests greater ability and sustained
capacity than alleged by the claimant; therefore, the undersigned
concludes that the claimant's subjective complaints and alleged
limitations are not fully persuasive and she retains the capacity to
perform work activities within the limitations set forth above.

Tr. 33-34.

The ALJ considered the opinion evidence including the information provided by State agency medical consultant, Loc Kim Le, M.D., who provided a physical RFC "conclusion stating that the claimant could perform sedentary exertional work with some limitations (Exhibit 4A) [Tr. 91-94 (Apr. 16, 2015, reconsideration level)]."[13] The ALJ gave Dr. Le's assessment "little weight to the extent that it states that the claimant has a lesser capacity to perform exertional activities than is consistent with the [RFC] detailed above, but it is given significant weight to the extent that it was otherwise consistent with the above findings." Tr. 34. The ALJ further noted: "The claimant admitted to being able to lift and carry between 10-20 pounds and there is nothing in the record to suggest more significant limitations than that; however, it is notable that even if the claimant were limited to the sedentary exertional level, the vocational expert testified that there would be jobs in the national economy (discussed above)."[14] *Id.*

---

[13] Although not given the same controlling weight or deference as the opinion of treating physicians, the findings of a state agency medical consultant regarding the nature and severity of a claimant's impairments must be treated as expert opinion at the ALJ and Appeals Council levels of administrative review. *See* SSR 96-6p, 1996 SSR LEXIS 3, at *4 (July 2, 1996) (rescinded and replaced by SSR 17-2p eff. Mar. 27, 2017). The findings of State agency medical consultant may provide additional evidence to support the ALJ's findings. *See* Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986).

[14] The ALJ asked the vocational expert a hypothetical question and the vocational expert provided three representative jobs, Tr. 36, 68-69; *see supra* at 5-6. The vocational expert also testified in response to a hypothetical question asked by Plaintiff's counsel that the hypothetical person could perform two representative jobs

The ALJ also considered the mental RFC conclusions provided by State agency psychological consultants, Jermaine Robertson, Ph.D., and Maurice Rudman, Ph.D. *Id.*; *see* Tr. 72-76, 79-82 (Jan. 12, 2015, initial (Robertson)), 85-91, 94-95 (Apr. 8, 2015, reconsideration (Rudman)) (; *see also supra* at n.13. Each consultant concluded that Plaintiff

> had mild limitations in activities of daily living, moderate limitations in social functioning, and mild limitations in concentration, persistence and pace (Exhibits 1A and 4A). Although these physicians were non-examining, and therefore their opinions did not the general matter deserve as much weight as that of examining or treating physicians, they do deserve substantial weight in a case like this in which the conclusions are largely consistent with the evidence. Nonetheless, the undersigned has assessed a slightly more restrictive [RFC] out of an abundance of caution in light of the evidence received at the hearing level and the claimant's testimony regarding her difficulty maintaining focus.
>
> In sum, the undersigned finds that the claimant has severe impairments that result in limitations to her functioning; however, she has no impairment, combination of impairments, or limitations severe enough to be disabled within the meaning of the Social Security Act.

Tr. 34-35.

## VI.

As the finder of fact, the ALJ is charged with the duty to evaluate all the medical opinions of the record and resolve conflicts that might appear.

---

that are unskilled and sedentary with occasional contact with the public and coworkers such as table worker and waxer each unskilled with an SVP of 2. Tr. 69.

20 C.F.R. § 416.927.[15]  When considering medical opinions, the following factors apply for determining the weight to give to any medical opinion: (1) the frequency of examination and the length, nature, extent of the treatment relationship; (2) the evidence in support of the opinion, such as "[t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight" that opinion is given; (3) the opinion's consistency with the record as a whole; (4) whether the opinion is from a specialist and, if it is, it will be accorded greater weight; and (5) other relevant but unspecified factors. 20 C.F.R. § 416.927(b) & (c)(1)-(6).

The opinion of the claimant's treating physician must be accorded considerable weight by the Commissioner unless good cause is shown to the contrary.  Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir. 1997). This is so because treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative

---

[15]  This provision applies to claims filed before March 27, 2017.  For claims filed after that date, section 416.920c, titled "How we consider and articulate medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017," applies.

examinations or brief hospitalizations." 20 C.F.R. § 416.927(c)(2). "This requires a relationship of both duration and frequency." Doyal v. Barnhart, 331 F.3d 758, 762 (10th Cir. 2003).

The reasons for giving little weight to the opinion of the treating physician must be supported by substantial evidence, Marbury v. Sullivan, 957 F.2d 837, 841 (11th Cir. 1992), and must be clearly articulated. Phillips, 357 F.3d at 1241. "The Secretary must specify what weight is given to a treating physician's opinion and any reason for giving it no weight, and failure to do so is reversible error." MacGregor, 786 F.2d at 1053.

The ALJ may discount the treating physician's opinion if good cause exists to do so. Hillsman v. Bowen, 804 F. 2d 1179, 1181 (11th Cir. 1986). Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supported a contrary finding," the opinion is "conclusory or inconsistent with [the treating physician's own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence or is wholly conclusory." Lewis, 125 F.3d at 1440; Edwards v. Sullivan, 937 F.2d 580, 583-84 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578,

582 (11th Cir. 1987)).  Further, where a treating physician has merely made

conclusory statements, the ALJ may afford them such weight to the extent

they are supported by clinical or laboratory findings and are consistent with

other evidence as to a claimant's impairments.  Wheeler v. Heckler, 784

F.2d 1073, 1075 (11th Cir. 1986).

    Further, opinions on some issues, such as whether the claimant is

unable to work, the claimant's RFC, and the application of vocational

factors, "are not medical opinions, . . . but are, instead, opinions on issues

reserved to the Commissioner because they are administrative findings that

are dispositive of the case; i.e., that would direct the determination or

decision of disability."  20 C.F.R. § 416.1527(d); see Bell v. Bowen, 796

F.2d 1350, 1353-54 (11th Cir. 1986).  "[T]reating source opinions on issues

reserved to the Commissioner are never entitled to controlling weight or

special significance."  SSR 96-5p, 1996 SSR LEXIS 2, at *6 (July 2, 1996)

(rescinded eff. Mar. 27, 2017).  Although physician's opinions about what a

claimant can still do or the claimant's restrictions are relevant evidence,

such opinions are not determinative because the ALJ has responsibility of

assessing the claimant's RFC.

    When a claimant attempts to prove disability based on the claimant's

subjective testimony, the claimant must provide evidence of an underlying

medical condition in either objective medical evidence confirming the severity of the alleged symptoms or evidence establishing that the medical condition could reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 416.929(a)-(b); SSR 16-3p, 2016 SSR LEXIS 4 (Mar. 16, 2016) (replacing SSR 96-7p, 1996 SSR LEXIS 4 (July 2, 1996) (eff. Mar. 16, 2016, eliminating "the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term. In so doing, we clarify that subjective symptom evaluation is not an examination of an individual's character. Instead, we will more closely follow our regulatory language regarding symptom evaluation." 2016 SSR LEXIS 4, at *1-2); Wilson v. Barnhart, 284 F. 3d1219, 1225-26 (11th Cir. 2002). An ALJ need only articulated explicit and adequate reasons for discrediting Plaintiff's testimony. *See* 20 C. F. R. § 416.929; Dyer v. Barnhart, 395 F. 3d 1206, 1210 (11th Cir. 2005) (citing Holt v. Sullivan, 921 F. 2d 1221, 1223 (11th Cir. 1991)). Further, it is an ALJ's province to determine whether to credit a claimant subjective testimony and a reviewing court will not disturb an ALJ's clearly articulated determination supported by evidence. *See* Mitchell v. Comm'r of Soc. Sec. Admin., 771 F. 3d7 80, 781 (11th Cir. 2014).

In this case, substantial evidence supports the ALJ's finding that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the evidence.  Tr. 32-33.  The ALJ's discussion of the objective medical evidence provides substantial evidence to support the ALJ's evaluation of Plaintiff subjective statements.  Tr. 30-35.  Specifically, the ALJ noted Plaintiff's "abnormal objective findings in the record have generally been noted as mild or moderate in nature and her reports of symptomology have been somewhat inconsistent."  Tr. 33.  Although the record indicates Plaintiff was diagnosed with various conditions, her diagnoses do not establish work-related limitations.  Tr. 30-32; *see* Moore, 405 F. 3d at 1213 n.6.

The ALJ also found that Plaintiff was noncompliant with her treatment.  Tr. 33-34.  An ALJ may consider a claimant's noncompliance together with the other evidence in evaluating her allegations.  *See generally* Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (relying on the ALJ's consideration of noncompliance when adequately supported).  The ALJ explained, and the record supports, several instances where

Plaintiff testified and reported to treating sources that she was noncompliant.  Tr. 33-34.

The ALJ properly considered Plaintiff's daily activities in evaluating her subjective complaints of disabling symptoms.  Tr. 32-33; *see supra* at n.4.  Plaintiff is able to live independently with her dog, handle personal care, prepare simple meals, and perform household chores, including spending "all day" cleaning, doing laundry, ironing, and handling yard tasks.  Tr. 33, 232-36, 239.  Plaintiff is able to use public transportation, shop for groceries, handle finances, read, and write.  *Id.*  Plaintiff testified that she functions well when taking her medications.  Tr. 32-33, 51-52.

Substantial evidence supports the ALJ's consideration of the evidence in this record including the medical records, the consultative examination evaluation and State agency consultant record reviews, and Plaintiff's pre-hearing reports and hearing testimony.  Substantial evidence also supports the ALJ's RFC determination and that Plaintiff can perform, with limitations, representative jobs in the national economy as testified to by the vocational expert.

Finally, the ALJ is not required to further develop the record before concluding Plaintiff was less impaired than she claimed. "Under the social

security regulations, the ALJ may order consultative examinations if the

medical evidence submitted by the claimant does not provide enough

information about an impairment to determine whether the claimant is

disabled." Salazar v. Comm'r of Soc. Sec., 372 F. App'x 64, 67 (11th Cir.

2010) (unpublished) (citing 20 C.F.R. § 416.917).  But the ALJ "is not

required to order additional examinations if the evidence in the record is

sufficient to allow him to make an informed decision." *Id.* (citing Ingram v.

Comm'r of Soc. Sec., 496 F.3d 1253, 1269 (11th Cir. 2007)).

Plaintiff notes that Dr. Greenberg's February 2, 2015, evaluation was

the last consultative evaluation performed and cryptically argues the ALJ

erred in not ordering another mental consultative evaluation.[16]  ECF No. 14

at 9.  During the hearing, Plaintiff's counsel did not request a follow-up

consultative mental evaluation, Tr. 42-71, nor did he do so in a May 3,

---

[16]  Dr. Greenberg suggested a "psychological evaluation if this has not already been done."  Tr. 442.  Dr. Greenberg's evaluation primarily dealt with Plaintiff's physical issues, although he performed an examination of Plaintiff's neurological system that revealed Plaintiff was "alert and oriented to time, place, person."  He ultimately diagnosed Plaintiff with bipolar disorder, Tr. 442, as noted by the ALJ.  Tr. 31.  The ALJ referred to March 2016 patient notes from Meridian stating, in part: "She was continued on her medication regimen and referred for a full evaluation due to polypharmacy use (Exhibit 17F) [Tr. 639-41]."  Tr. 32.  The Meridian records end on April 18, 2016, which state, in part: "The need for a full psych eval was established at last f/u due to excessive polypharm."  Tr. 643 (Exhibit 18F); *see* Tr. 32.  On January 30, 2017, Plaintiff's counsel provided the Appeals Council with a one-page letter and did not mention a follow-up psychiatric evaluation at Meridian or elsewhere or the need to have a consultative mental examination.  Tr. 7.  The ALJ entered the decision on June 29, 2016, Tr. 36, and the Appeals Council denied review April 4, 2017.  Tr.1-4.

2016, pre-hearing brief. Tr. 292-94.  Likewise, Plaintiff's current counsel did not request a referral for a consultative mental evaluation in his January 30, 2017, letter to the Appeals Council.  Tr. 7.

Notwithstanding Dr. Greenberg's recommendation, *see supra* at n.16, and aside from making a generic argument regarding this issue, Plaintiff did not demonstrate the record was deficient.  The ALJ considered Plaintiff's evaluations and treatment at Meridian from December 2014 through April 2016 and Dr. Greenberg's February 2015 consultative examination results. Tr. 30-32.  No error has been shown.  *See* ECF No. 17 at 6 n.3.

## VI.  Conclusion

Considering the record as a whole, the ALJ's findings are based upon substantial evidence in the record and the ALJ correctly applied the law. Accordingly, it is respectfully recommended that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED** and Judgment entered for Defendant.

**IN CHAMBERS** at Tallahassee, Florida, on January 31, 2018.

**s/ Charles A. Stampelos_____**
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific**

written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a Report and Recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. R. 3-1; 28 U.S.C. § 636.